UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| WILLIS A. LAYTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:07CV121 LMB |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Willis A. Layton for Supplemental Security Income benefits under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 15).

### Procedural History

On October 21, 2004, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on October 2, 1998. (Tr. 114). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 30, 2006. (Tr. 14-21). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 21, 2007. (Tr. 9, 5). Thus, the

decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

**A.** **ALJ Hearing**

Plaintiff's administrative hearing was held on October 6, 2005. (Tr. 24). Plaintiff was present and was represented by counsel. (Id.). Witness Joyce Hall was present. (Id.). Also present was vocational expert John Grenfell. (Id.). The ALJ began the hearing by admitting all of the exhibits into the record. (Tr. 351).

Plaintiff's attorney then examined plaintiff, who testified that he was 51 years of age and was single. (Tr. 27). Plaintiff stated that he lived alone. (Id.). Plaintiff testified that he attended school until the tenth grade and obtained his GED. (Id.). Plaintiff stated that he had two minor children who lived in Texas. (Id.).

Plaintiff testified that he last worked on October 1, 1998. (Id.). Plaintiff stated that he was unable to work at the time of the hearing because his back frequently gives out, he has lost part of the hearing in his left ear, his right knee becomes inflamed, and his collarbone is fractured. (Tr. 28). Plaintiff testified that he also experiences depression. (Id.).

Plaintiff stated that he began experiencing problems with his back in June of 1999 due to an injury from lifting his sons. (Id.). Plaintiff testified that both of his sons had muscular dystrophy.[1] (Id.). Plaintiff stated that he had to carry his sons from their beds to the bathroom. (Id.). Plaintiff testified that one of his sons weighed 100-150 pounds and the other son weighed

---

[1]A general term for a number of hereditary, progressive degenerative disorders affecting skeletal muscles, and often other organ systems. See Stedman's Medical Dictionary, 604 (28th Ed. 2006).

75-80 pounds at the time. (Tr. 29).

Plaintiff stated that he sought treatment for his back from Dr. Dick Newell. (Id.). Plaintiff testified that Dr. Newell administered trigger shot injections and prescribed pain medication. (Id.). Plaintiff stated that he has not undergone surgery for his back.

Plaintiff testified that he has lost hearing in his left ear. (Id.). Plaintiff stated that he did not know the cause of the hearing loss. (Id.). Plaintiff testified that he began losing his hearing in October 1998. (Id.). Plaintiff stated that he underwent a hearing test, which revealed that he only had between two and twenty percent of his hearing in his left ear. (Id.). Plaintiff testified that he can hear out of his right ear. (Id.).

Plaintiff stated that he has trouble with his right knee. (Tr. 30). Plaintiff testified that he was involved in an automobile accident in the 1980s, which caused him to dislocate his right kneecap. (Id.). Plaintiff stated that his knee injury was treated when he lived in Texas. (Id.). Plaintiff testified that after he moved to Missouri, he received treatment at the VA. (Id.). Plaintiff stated that fluid was drained from his knee at the VA, which relieved his pain. (Id.). Plaintiff testified that his knee started bothering him a year prior to the hearing, at which time he sought treatment from Dr. Newell. (Id.). Plaintiff stated that Dr. Newell sent him to Dr. LaCoeur, a specialist in Poplar Bluff. (Id.). Plaintiff testified that he has not undergone surgery on his knee. (Id.).

Plaintiff stated that he has problems with his collarbone. (Id.). Plaintiff testified that Dr. Knight told him that his collarbone was not growing properly after it had been broken. (Id.). Plaintiff stated that Dr. Knight is a bone specialist. (Id.). Plaintiff testified that he fractured his collarbone in August of 2002. (Tr. 31). Plaintiff stated that his collarbone injury causes him to

experience pain when he lifts. (Id.).

Plaintiff testified that he can lift 20 to 30 pounds. (Id.).

Plaintiff stated that he can walk about one fifth of one mile. (Tr. 32). Plaintiff testified that he experiences pain in his right hip after walking one tenth of one mile. (Id.).

Plaintiff stated that he does not drive because he does not have a driver's license. (Id.).

Plaintiff testified that he can sit long enough to watch a program on television that he enjoys, otherwise he gets up after thirty minutes. (Id.).

Plaintiff stated that he does not hunt or fish because he does not have the transportation or money to do so. (Tr. 33). Plaintiff testified that he is physically able to fish but not hunt. (Id.).

Plaintiff stated that on a typical day, he "piddles." (Id.). Plaintiff testified that he works on lawnmowers and talks to his dogs. (Id.).

Plaintiff stated that he experiences depression. (Id.). Plaintiff testified that his children live in Texas and he is unable to see them. (Id.). Plaintiff stated that every time he has attempted to see his children he has been "thrown in jail." (Id.).

Plaintiff testified that he is unable to work because he cannot perform tasks such as lifting for long periods. (Id.). Plaintiff stated that his knees also give out on him. (Tr. 34). Plaintiff testified that his back is his biggest problem. (Id.). Plaintiff stated that his back gives out on him. (Id.). Plaintiff testified that he has to stand up after thirty minutes due to back pain. (Id.). Plaintiff stated that walking relieves the pressure in his back. (Id.).

Plaintiff testified that he shops for groceries, cooks, cuts his grass, and performs all other chores. (Id.). Plaintiff stated that it takes him a long time to complete tasks. (Id.).

Plaintiff testified that he can stand for about thirty minutes to one hour before he has to sit

down or walk around due to back or knee pain. (Tr. 35).

The ALJ next questioned plaintiff, who testified that he has not undergone physical therapy for his back. (Id.). Plaintiff stated that the trigger point injections he receives help relieve his pain but they negatively affect his mind. (Id.).

Plaintiff testified that he has not had a valid driver's license for over twenty years. (Tr. 36). Plaintiff stated that he has been convicted of six DWIs and he had a seventh DWI pending at the time of the hearing. (Id.). Plaintiff testified that he was convicted of his last DWI on October 1, 1998. (Id.). Plaintiff stated that at that time, he was sentenced to 120 days shock incarceration because he was convicted of three DWIs in one year. (Id.). Plaintiff testified that he accepted the 120 day shock incarceration sentence because he knew it was the only way he would stop drinking. (Id.). Plaintiff stated that he was convicted of three DWIs in 1986, for which he was sentenced to three years incarceration. (Id.). Plaintiff testified that he was unable to get his driver's license reinstated after the first three DWIs. (Id.). Plaintiff stated that he was charged with the current DWI in April of 2004. (Id.).

Plaintiff testified that he last drank two weeks prior to the hearing. (Id.). Plaintiff stated that when he drank, he would drink a half pint of vodka in three or four days. (Tr. 38). Plaintiff testified that he drank heavily in 1998. (Id.). Plaintiff stated that he did not quit drinking following the 120 day shock incarceration. (Id.).

Plaintiff testified that he has complained of depression to his doctors. (Tr. 39). Plaintiff stated that Dr. Newell prescribed medication for his depression. (Tr. 40). Plaintiff testified that at the time of the hearing, he was only taking aspirin because he had not seen a doctor since May of 2005. (Id.). Plaintiff stated that he took medication for depression from 1998 until May of 2005.

(Id.).

The ALJ noted that plaintiff had only been seeing Dr. Newell since November of 2004. (Id.). Plaintiff stated that he had been receiving trigger point injections from Dr. Newell since 1999. (Tr. 41). Plaintiff testified that Dr. Newell prescribed medication for his depression and pain. (Id.). Plaintiff stated that Dr. Newell also prescribed sleeping pills. (Tr. 42).

Plaintiff testified that Dr. Newell sent him to Dr. LaCoeur for his knees more than a year prior to the hearing, after he injured his knee in an automobile accident. (Tr. 43).

Plaintiff stated that he is able to bend, stoop, or squat down to the floor from a standing position and pick up something that weighs twenty pounds or less. (Tr. 44). Plaintiff testified that he is able to climb one flight of stairs with handrails. (Id.).

Plaintiff stated that he prepares his own meals, washes dishes, vacuums, sweeps, and does his laundry at his sister's house. (Id.). Plaintiff testified that his sister lives a half mile from him. (Id.). Plaintiff stated that he rides a golf cart or lawnmower to his sister's house. (Tr. 45).

Plaintiff testified that he either uses his riding lawnmower or a push mower to mow his grass. (Id.). Plaintiff stated that he uses his riding lawnmower more than his push mower. (Id.).

Plaintiff testified that he visits with friends or neighbors every day. (Id.). Plaintiff stated that he usually visits with his sister and his brother because they both live a quarter of a mile from him. (Id.). Plaintiff testified that his family owns two acres of land near Circle City, on which he, two sisters, and one brother live. (Id.).

Plaintiff stated that he does not attend church or belong to any organizations. (Tr. 46).

Plaintiff's attorney then examined plaintiff's sister, Joyce Hall, who testified that she lives in the Circle City community. (Id.). Ms. Hall stated that she has observed the problems plaintiff

has with his knee. (Id.). Ms. Hall testified that plaintiff's knee becomes swollen and two days later, it becomes red with fever. (Tr. 47). Ms. Hall stated that she sees plaintiff several times a week. (Tr. 47). Ms. Hall testified that plaintiff lives about a half mile from her house. (Id.). Ms. Hall stated that plaintiff has complained about his knee to her. (Id.). Ms. Hall testified that she has seen plaintiff's knee swollen on more than one occasion. (Id.). Ms. Hall stated that she last observed plaintiff's knee in this condition several months prior to the hearing. (Id.).

Ms. Hall stated that she has observed plaintiff when he appeared to be depressed. (Tr. 48). Ms. Hall testified that when plaintiff is depressed, he appears upset and angry. (Id.). Ms. Hall stated that plaintiff experiences depression because he lost his mother in 2001 and then he lost his oldest son in 2002. (Id.).

Ms. Hall testified that plaintiff's oldest son died of muscular dystrophy. (Id.). Ms. Hall stated that plaintiff's other son also has muscular dystrophy and he is not expected to live very long. (Id.). Ms. Hall testified that plaintiff is unable to see his son because he lives in Texas. (Id.). Ms. Hall stated that plaintiff also has a daughter in Texas that he is unable to see. (Id.).

Ms. Hall testified that plaintiff becomes very depressed because he is unable to see or talk to his children. (Id.). Ms. Hall stated that when plaintiff becomes depressed, he acts "mopey," and starts drinking. (Id.). Ms. Hall testified that when plaintiff is mopey, he is solemn, does not talk, and is on the verge of tears. (Tr. 49).

Ms. Hall testified that plaintiff has lived with her in the past but not within the past few years. (Id.). Ms. Hall stated that plaintiff lives across the field from her. (Id.).

Ms. Hall testified that she does not know if plaintiff has friends that visit him at his home. (Id.). Ms. Hall stated that plaintiff mostly visits with his family members. (Id.). Ms. Hall testified

that many people stop by to visit their family to talk about motor vehicles and lawnmowers. (Tr. 50). Ms. Hall stated that she visits with plaintiff at his home. (Id.). Ms. Hall testified that plaintiff keeps his home organized and clean. (Id.).

Ms. Hall stated that plaintiff does not attend church or any club or organization meetings. (Id.). Ms. Hall testified that plaintiff generally stays to himself other than visiting with his family members. (Id.). Ms. Hall stated that plaintiff occasionally makes trips to visit friends. (Id.).

Ms. Hall testified that plaintiff is a hard worker and is family oriented. (Tr. 51). Ms. Hall stated that plaintiff complains about back pain and his lack of hearing. (Id.). Ms. Hall testified that plaintiff has difficulty hearing out of one ear. (Id.). Ms. Hall stated that plaintiff has pain in his back and down his leg. (Id.).

The ALJ then examined the vocational expert, Dr. John Grenfell, who testified that he had reviewed the exhibits in this matter and was present throughout the testimony. (Tr. 52). The ALJ asked Dr. Grenfell to assume a hypothetical individual of plaintiff's age, education, training, and past relevant work experience, with the following limitations: able to perform the light levels of lifting and carrying with the need for an alternating sit-stand option; no requirement to sit more than thirty minutes to an hour at one time; no requirement to stand more than thirty minutes to one hour at one time; no requirement to walk more than a fifth of a mile at one time; and no stair climbing of more than one flight at a time, with the need for a handrail. (Tr. 52). Dr. Grenfell testified that the individual would not be able to perform any of plaintiff's past relevant work because plaintiff's past work as a trim carpenter required that he stand on a full-time basis. (Id.). Dr. Grenfell stated that the individual would be able to perform other work. (Id.). Dr. Grenfell testified that the individual could work as a clerk at a self-service gas station, of which 2,500 such

positions exist in the state of Missouri and 60,000 in the national economy. (Id.). Dr. Grenfell stated that the individual could work as an office machine operator, of which 900 positions exist in Missouri and 40,000 in the national economy. (Tr. 53). Finally, Dr. Grenfell testified that the individual could work as a cashier in a variety of settings at the unskilled light level, and that 35,000 of such positions exist in Missouri and 1,600,000 in the national economy. (Id.).

The ALJ then asked Dr. Grenfell to assume that he were to find fully credible all of plaintiff's complaints and limitations as testified to by plaintiff and his sister. (Id.). Dr. Grenfell testified that the hypothetical individual with these limitations would not be able to perform the jobs that he previously described because the individual would exceed the number of absences that an employer would tolerate due to his complaints and because he appears to have problems with memory or attention to detail. (Id.). Dr. Grenfell stated that if the ALJ finds plaintiff's testimony supported by the medical record, then there would be no jobs that plaintiff would be able to perform. (Id.).

Plaintiff's attorney stated that he had no questions for Dr. Grenfell. (Id.).

The ALJ stated that he would consider additional medical records that plaintiff planned to submit and would make a decision after reviewing the additional records. (Id.).

## B.  Relevant Medical Records

The record reveals that plaintiff presented to Bloomfield Medical Clinic from July 2003, through April 2006 for various complaints, including low back pain, fractured clavicle, left ear pain, right knee pain, anxiety, and depression. (Tr. 176-92, 201-12, 234-45). Dick Newell, D.O.

diagnosed plaintiff with degenerative joint disease[2] in September 2004. (Tr. 203). Dr. Newell treated plaintiff with medication and referred him to a specialist for treatment of his knee. (Id.). On June 30, 2004, Dr. Newell administered trigger point injections. (Tr. 185). Dr. Newell diagnosed plaintiff with depression in December 2005. (Tr. 241). It was noted on February 14, 2005 that plaintiff's sister called to report that plaintiff took eight to ten of each medication in the first twenty-four hours after filling his medications. (Tr. 178).

Plaintiff presented to St. Francis Medical Center on August 26, 2004, with complaints of low back pain and right knee pain. (Tr. 224-25). Plaintiff was diagnosed with cellulitis,[3] prepatellar bursitis,[4] and osteoarthritis. (Tr. 225). Plaintiff underwent x-rays of his right knee, which revealed evidence of prior trauma to the knee without acute fracture or dislocation; and mild-to-moderate degenerative changes. (Tr. 228).

Plaintiff presented to Missouri Southern Healthcare on September 1, 2004, with complaints of right knee pain. (Tr. 213-21). Plaintiff was diagnosed with knee pain with patellar effusion and spur formation. (Tr. 217).

Plaintiff saw William E. Morehead, M.D. for a consultative examination at the request of the state agency on December 20, 2004. (Tr. 197-99). Plaintiff complained of back pain, pain in the left side of his neck and shoulder from a collar bone fracture, and poor hearing in his left ear.

---

[2]Degenerative joint disease, or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

[3]Inflammation of subcutaneous, loose connective tissue. Stedman's at 343.

[4]Inflammation of a bursa. Stedman's at 282.

(Tr. 197). Plaintiff also complained of depression due to the loss of his live-in girlfriend and their child. (Id.). Plaintiff reported that he had fractured his left collar bone in a three-wheeler accident eighteen months prior. (Id.). Plaintiff had fractured his right collarbone in the past. (Id.). Plaintiff indicated that he had injured his right knee about eighteen years prior. (Id.). Plaintiff reported that he had lost his last job in 1986 and that he had spent his time caring for his children with muscular dystrophy until they died. (Id.). Plaintiff indicated that his children had to be lifted and carried around and were in wheelchairs before they died. (Id.). Dr. Morehead noted that plaintiff had been taking Celebrex,[5] Naprosyn,[6] and Ultracet,[7] although he had been out of these medications for three days. (Id.). Upon examination, plaintiff's hearing was found to be normal in the right ear and poor in the left ear, with no visible abnormalities in the ear canal. (Tr. 198). Dr. Morehead noted that plaintiff had old fractures of both collar bones, and that plaintiff complained of quite a bit of pain in the left clavicle area. (Id.). Plaintiff had fairly normal range of motion of his back. (Id.). Plaintiff's neurological examination was normal. (Tr. 199). Plaintiff's gait was normal. (Tr. 193). Dr. Morehead's impression was depression; history of alcohol abuse; old fracture of right knee, approximately eighteen years ago, with traumatic arthritis in the right knee; old fractures of his clavicles, the more recent being in the left side with complaints of pain in the area of the fracture and in his neck and shoulder; poor hearing in his left ear; and no teeth,

---

[5]Celebrex is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis. See Physician's Desk Reference (PDR), 2590 (57th Ed. 2003).

[6]Naprosyn is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis. See PDR at 2891-92.

[7]Ultracet is an analgesic indicated for the short-term (five days or less) management of acute pain. See PDR at 2508-09.

- 11 -

with only an upper denture. (Tr. 199). Dr. Morehead expressed the opinion that plaintiff could perform all work-related functions, such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling. (Tr. 193).

Marsha J. Toll, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique on December 21, 2004. (Tr. 144-56). Dr. Toll found that plaintiff's depression was not severe and caused no functional limitations. (Id.).

## **The ALJ's Determination**

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since his alleged onset date.

2. The claimant has a severe combination of impairments, including: mild-to-moderate degenerative changes in his right knee with soft tissue inflammation; diminished hearing in his left ear, a mild fracture of his left clavicle, and post traumatic arthritis in his lumbar spine. His depression and anxiety have not been severe for any 12 consecutive months and they do not impose any non-exertional limitations.

3. These medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant is found credible to the extent of and the claimant's residual functional capacity and limitations are found to be the light levels of lifting and carrying, with the need for an alternate sit/stand option, with no requirement to walk more than one-fifth of a mile at one time, no requirement to stand more than 30 minutes to one hour at one time, no requirement to sit more than 30 minutes to one hour at one time, with a limitation to no stair climbing of more than one flight at one time, with the need for a handrail.

6. The claimant is closely approaching advanced age.

7. The claimant has a general education diploma.

8. The claimant has past relevant work as a carpenter and a factory worker.

9. It is not relevant to reaching a decision in this case whether the claimant has any transferable skills or not.

10. Although the claimant's exertional limitations do not allow him to perform the full range of light work, a finding of "not disabled" is appropriate within the framework of Medical-Vocational Rule 201.13. There are a significant number of jobs in the state and national economies that the claimant could perform. Examples of such jobs include clerk in a self-service gas station, office machine operator, and cashier jobs in a variety of setting.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 20-21).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the application filed on October 21, 2004, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 21).

## Discussion
### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

### B.  The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.      Plaintiff's Claims**

Plaintiff raises two claims on appeal from the decision of the Commissioner. Plaintiff first argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation. Plaintiff next argues that the ALJ erred in failing to assess the combination of impairments suffered by plaintiff. The undersigned will address plaintiff's claims in turn.

**1.      Credibility Analysis**

Plaintiff argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation. Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 18). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed the medical evidence. The ALJ noted that an August 2004 x-ray of plaintiff's knee revealed only mild-to-moderate degenerative changes. (Tr. 16, 228). With regard to plaintiff's back impairment, the ALJ stated that the medical records show no evidence of radiculopathy or other neurological deficits, atrophy, muscle loss, or spasms. (Tr. 16). Further, the ALJ pointed out that Dr. Morehead found no abnormalities on his December 2004 examination and expressed the opinion that plaintiff had no work-related limitations. (Tr. 16, 197-99). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ next stated that plaintiff worked only sporadically prior to the alleged disability onset date. (Tr. 18). The ALJ noted that an award of Supplemental Security Income payments

would result in more annual income for plaintiff than he has ever earned. (Id.). The ALJ found that plaintiff's poor earnings record indicated little financial incentive or motivation to seek employment and reflects poorly on his credibility. (Id.). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). A poor work history prior to the alleged onset of disability lessens the credibility of a plaintiff's allegations of disabling pain. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993).

The ALJ next discussed plaintiff's daily activities. (Tr. 18). The ALJ noted that plaintiff testified that he prepares his own meals, washes his dishes, vacuums, grocery shops, does his own laundry, cuts his grass, and has visitors every day. (Tr. 18, 34, 45). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

The ALJ next noted that plaintiff has only sought sporadic treatment for his various complaints. This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ pointed out the fact that plaintiff does not take any prescription pain medication but rather only takes aspirin for his pain. (Tr. 18). A lack of strong pain medication is inconsistent with subjective complaints of disabling pain. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). The ALJ also noted that plaintiff previously took non-steroidal anti-inflammatory medications for his impairments, but his compliance with these medications was

suspect. (Tr. 18). For example, the ALJ pointed out that when plaintiff saw Dr. Morehead on December 20, 2004, Dr. Morehead indicated that plaintiff had been out of his prescribed medications for three days. (Tr. 19, 197). In addition, on February 14, 2005, plaintiff's sister indicated that he took between eight and ten tablets of each of his medications within the first twenty-four hours of receiving his prescriptions. (Tr. 19, 178). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

**2.     Assessment of Combination of Impairments**

Plaintiff argues that the ALJ erred by failing to assess plaintiff's impairments in combination and to assess the total impact of these impairments on plaintiff's ability to work. Plaintiff's argument lacks merit. The ALJ explicitly found that plaintiff had a severe "combination of impairments." (Tr. 20). The ALJ referred numerous times in his opinion to plaintiff's "combination of impairments" in determining that plaintiff was not disabled. (Tr. 16-20). In addition to referring to plaintiff's "combination of impairments," the ALJ evaluated each of plaintiff's impairments individually in detail in his decision. "To require a more elaborate

articulation of the ALJ's thought processes would not be reasonable." <u>Mason v. Callahan</u>, 983 F. Supp. 1261, 1267 (E.D. Mo. 1997) (quoting <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); <u>Gooch v. Secretary of Health and Human Services</u>, 833 F.2d 589, 592 (6th Cir. 1987)). Thus, the ALJ properly considered plaintiff's impairments both individually and in combination in making his determination.

## **Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this memorandum.

Dated this   29th   day of September, 2008.

*Lewis M. Blanton*
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE